**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

CONFEDERATED TRIBES AND
BANDS OF THE YAKAMA INDIAN
NATION,
*Plaintiff-Appellant,*

v.

CHRISTINE O. GREGOIRE, Governor
of the State of Washington; CINDI
HOLMSTROM, Director of the
Washington State Department of
Revenue; LESLIE CUSHMAN, Deputy
Director of the Washington State
Department of Revenue; STUART
THRONSON, Assistant Director of
Special Programs of the
Washington State Department of
Revenue; PAT PARMER, Chief of
Enforcement and Education
Division of the Washington State
Liquor Control Board,
*Defendants-Appellees.*

No. 10-35776

D.C. No.
2:08-cv-03056-
RHW

OPINION

Appeal from the United States District Court
for the Eastern District of Washington
Robert H. Whaley, Senior District Judge, Presiding

Argued and Submitted
August 3, 2011—Seattle, Washington

Filed September 23, 2011

18159

Before: John T. Noonan, Jr. and Milan D. Smith, Jr.,
Circuit Judges, and Andrew J. Guilford, District Judge.*

Opinion by Judge Milan D. Smith, Jr.;
Concurrence by Judge Guilford

---

*The Honorable Andrew J. Guilford, United States District Judge for
the Central District of California, sitting by designation.

## COUNSEL

Phillip E. Katzen, Cory J. Albright, and Zach Welcker; Kanji & Katzen, PLLC, Seattle, Washington, for the appellants

Robert M. McKenna, Attorney General of Washington, Heidi A. Irvin, David M. Hankins, and Robert K. Costello, Office of the Attorney General, Olympia Washington, for the appellees.

## OPINION

M. SMITH, Circuit Judge:

States lack authority to tax Indian tribes or registered members of Indian tribal organizations absent a clear authorization from Congress. *Cnty. of Yakima v. Confederated Tribes & Bands of the Yakima Indian Nation*, 502 U.S. 251, 258 (1992). The Tribes of the Yakama Nation (the Yakama or Tribes) claim that this principle of Indian tax immunity has been violated by the State of Washington's current cigarette excise tax, which the Tribes argue leaves their retailers liable

for payment of the tax when retailers sell cigarettes to non-Indians.

In 1978, a three-judge district court held that the legal incidence of the Washington cigarette tax did not fall on the Tribes. *Confederated Tribes of Colville Indian Reservation v. Washington*, 446 F. Supp. 1339 (E.D. Wash. 1978). In 1980, the Supreme Court agreed with the three-judge court and upheld the validity of Washington's cigarette tax and its requirement that tribal retailers collect the tax from non-Indian cigarette purchasers. *Washington v. Confederated Tribes of the Colville Indian Reservation*, 447 U.S. 134, 159-61 (1980). Although some elements of Washington's cigarette tax law have been modified over the past thirty years, we conclude, as did the district court in awarding summary judgment to the State, that none of those changes has materially altered the legal incidence of the cigarette tax approved of in *Colville*, and we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. The Washington State Cigarette Tax

The State of Washington levies a general excise tax on all cigarettes sold, used, consumed, handled, possessed or distributed within the State. *See* Revised Code of Washington (RCW) §§ 82.24 *et seq.* (the Act or cigarette tax); *see also id.* §§ 82.24.020, 82.24.026. This excise tax is levied "at the time and place of the first taxable event and upon the first taxable person within [the] [S]tate." RCW § 82.24.080(2).

The cigarette tax primarily is collected from licensed cigarette wholesalers, who purchase tax stamps from the Washington Department of Revenue (the Department), and then affix the stamps on each package (or other unit) of cigarettes they distribute to retailers. RCW § 82.24.030; *see also* Wash. Admin. Code (WAC) § 458-20-186(101)(b). Wholesalers are required to affix the stamps prior to their distribution of ciga-

rettes to retailers. RCW §§ 82.24.010(8), 82.24.030; WAC § 458-20-186(101)(b). Only licensed wholesalers may possess unstamped cigarettes, and only then under certain conditions. RCW §§ 82.24.040(2), 82.24.050.[1] Moreover, only licensed wholesalers may purchase or obtain cigarette stamps. RCW § 82.24.040(3). Transporting or selling unstamped cigarettes may constitute a misdemeanor or a felony. RCW §§ 82.24.110, 82.24.250, 82.24.260.

"Licensed wholesalers are compensated for affixing the stamps at the rate of $6.00 per thousand stamps affixed." WAC § 458-20-186(201)(b). Wholesalers who affix cigarette tax stamps "may, if they wish, absorb five one-hundredths cents per cigarette of the tax and not pass it on to purchasers without being in violation of th[e Act] or any other act relating to the sale or taxation of cigarettes." RCW § 82.24.020(2). If a wholesaler posts a bond with the State, it may defer payment of the tax for up to thirty days. *See* WAC § 458-20-186(201)(b) ("Payment for stamps must be made at the time of purchase unless the wholesaler has prior approval of the [D]epartment to defer payment and furnishes a surety bond equal to the proposed monthly credit limit."). This arrangement gives the wholesaler a grace period within which to collect the amount of the cigarette tax from retailers prior to paying it over to the Department.

The Act contains several provisions exempting certain entities and persons from its strictures. For example, RCW § 82.24.020 allows enrolled members of federally recognized Indian tribes to "purchase cigarettes from an Indian tribal

---

[1]Collection from wholesalers who affix stamps is not the exclusive means of collecting the tax. The Department collects the tax by other means with respect to cigarettes that are *not* sold by Washington retailers. For example, when a manufacturer gives away cigarettes for advertising, promotional, or other purposes, the manufacturer pays the tax directly to the Department. WAC § 458-20-186(101)(d), (602)(f). When a Washington resident purchases cigarettes from an *out-of-state* retailer, the resident pays the tax directly to the Department. *Id.* § 458-20-186(602)(g).

organization under the jurisdiction of the member's tribe for the member's own use *exempt from* the applicable taxes imposed by this chapter." RCW § 82.24.020(4) (emphasis added).[2] Section 82.24.250 allows Indian tribal organizations to possess *unstamped* cigarettes provided they "give[ ] notice to the board in advance of receiving unstamped cigarettes and . . . within a period of time after receipt of the cigarettes as . . . the person . . . cause[s] stamps to be affixed in accordance with RCW [§ ] 82.24.030 or otherwise ma[kes] payment of the tax required." RCW § 82.24.250(7)(c).

Also exempted from the notice, stamping, and cigarette tax requirements of the Act are lawful transactions covered by cigarette tax compacts between Indian tribes and the State under RCW §§ 43.06.450 *et seq.*, wherein an Indian tribe imposes a tribal tax in lieu of the State tax. *See also id.* § 82.24.020(5) (terms of contract under compact statute control over conflicting provisions of chapter 82.24). This exemption was added in 2001 "to promote economic development, provide needed revenues for tribal governments and Indian persons, and enhance enforcement of the state's cigarette tax law, ultimately saving the state money and reducing conflict." RCW §§ 43.06.450; 43.06.455(3), (8).

---

[2]Another section of the Act, RCW § 82.24.260, provides similar language clarifying the exemption:

(1) Other than:

(a) A wholesaler required to be licensed under this chapter;

(b) A federal instrumentality with respect to sales to authorized military personnel; or

(c) An Indian tribal organization with respect to sales to enrolled members of the tribe,

a person who is in lawful possession of unstamped cigarettes and who intends to sell or otherwise dispose of the cigarettes shall pay, or satisfy its precollection obligation that is imposed by this chapter, the tax required by this chapter by remitting the tax or causing stamps to be affixed in the manner provided in rules adopted by the department.

Although the Act contains many provisions excluding registered tribes from its provisions, it does require them to collect the cigarette tax from non-Indians who purchase cigarettes from Indian retailers. For instance, the Act contains a statement of legislative intent requiring Indian tribes to serve as tax collectors and remitters:

It is the intent of the legislature that, in the absence of a cigarette tax contract or agreement . . . applicable taxes imposed by this [Act] *be collected* on cigarettes sold by an Indian tribal organization to any person who is not an enrolled member of the federally recognized Indian tribe within whose jurisdiction the sale takes place consistent with collection of these taxes generally within the state. The legislature finds that applicable collection and enforcement measures under this chapter are reasonably necessary to prevent fraudulent transactions and place a minimal burden on the Indian tribal organization, pursuant to the United States supreme court's [sic] decision in *Washington v. Confederated Tribes of the Colville Indian Reservation*, 447 U.S. 134 (1980).

RCW § 82.24.080(4) (emphasis added). However, the State legislature has also instructed that the Act should be construed to "not apply in any case in which the State of Washington is prohibited from taxing under the Constitution of [Washington] or the Constitution or laws of the United States." RCW § 82.24.900. This language is referred to by the State as the "constitutional backstop."

The Department has also adopted administrative rules concerning the collection of cigarette taxes from Indian retailers. *See* WAC § 458-20-186(102)(c).[3] Indian retailers making on-

---

[3](c) **Cigarettes purchased from Indian retailers**. Special rules apply to cigarettes purchased from Indian retailers.

reservation sales to nonmembers of the tribe must "collect and remit" the State's retail sales tax and cigarette tax. WAC § 458-20-192(5)(c). As the Department sees it, if a tribal retailer sells cigarettes to nonmembers, the wholesaler is obligated to pre-collect the tax, and the tribal retailer must purchase a stock of cigarettes with tax stamps affixed to the packages for such sales. The tribal retailer would then collect the amount of the tax from nonmember customers. *See* WAC § 458-20-192(9)(a)(i). The Department refers to this as the "pre-collection obligation."

The Department is also authorized by the Act to promulgate rules allowing for a refund to "dealers for the cost of stamps affixed to articles taxed . . . which by reason of damage become unfit for sale and are destroyed by the dealer or returned to the manufacturer." RCW § 82.24.210. Under the Department's rules, "[a]ny person may request a refund of the face value of the stamps when the tax is not applicable and the stamps are returned to the department." WAC § 458-20-186(203).

---

(i) Indians purchasing cigarettes in Indian country are exempt from the state cigarette tax; however, these sales must comply with WAC 458-20-192. Other consumers may purchase cigarettes for their personal consumption from 'qualified Indian retailers' without incurring liability for state cigarette tax. A 'qualified Indian retailer' is one who is subject to the terms of a valid cigarette tax contract with the state pursuant to RCW § 43.06.455.

(ii) Consumers who purchase cigarettes from Indian retailers who are not subject to a cigarette tax contract with the state must comply with the reporting requirements and remit the cigarette tax as explained in subsection (602) of this rule. These consumers are also liable for the use tax on their purchases.

(iii) It is the duty of the consumer in each instance to ascertain his or her responsibilities with respect to such purchases.

### B.   Yakama Nation Retailers

The Yakama Nation is a federally-recognized Indian nation with approximately 10,000 enrolled members. It is a party to the Yakama Treaty of 1855 with the United States, 12 Stat. 951, and it exercises the sovereign right of self-government over the 1.4 million-acre Yakama Indian Reservation, located in central Washington. There are nine Yakama member-owned businesses on the reservation engaged in the retail sale of cigarettes and other tobacco products. Each of these businesses is organized, licensed, and operates under the laws of the Yakama Nation. By affixing Yakama Nation tax stamps, the Nation imposes a tax on tobacco products sold by Yakama retailers. The revenues generated by this tax support essential tribal government services, as well as fisheries, forestry, and other programs.

In 2004, the Yakama entered into a cigarette tax compact with the State (the 2004 Agreement). Under the 2004 Agreement, the Tribes were required to impose and maintain a tribal tax on the retail sales of cigarettes equal to the amount of State and local sales taxes. Despite the compact, disputes arose between the Yakama and the State, and in February 2007, the Department sent a notice to the Tribes indicating its intent to terminate the 2004 Agreement. Following unsuccessful dispute-resolution talks, the 2004 Agreement was terminated in July 2008. The Department thereupon informed the Yakama that it was reinstating the cigarette tax on sales of cigarettes to nonmembers of the Tribes, and that it would require cigarette tax stamps to be affixed for all such sales.

### C.   Procedural History

Before any cigarette taxes could be collected by the State after the termination of the 2004 Agreement, the Yakama commenced this action in September 2008, seeking declarations (1) that it is unlawful for the State to tax Indian-to-Indian sales; (2) that RCW §§ 82.24 *et seq.* is unenforceable

against the Yakama; (3) that acquiring and possessing unstamped cigarettes is not prohibited by the Act; (4) that it is unlawful for the State to prohibit the Yakama from issuing cigarette stamps; and (5) that the State has violated the Ex Post Facto Clause of the Constitution. Shortly after the suit was filed, the district court entered a temporary restraining order against the State. Thereafter, the parties cross-moved for summary judgment. In January 2010, the district court denied the Yakama's motion for summary judgment and granted summary judgment to the State on most of the Yakama's claims. *See Confederated Tribes & Bands of the Yakama Nation v. Gregoire*, 680 F. Supp. 2d 1258 (E.D. Wash. 2010).

For purposes of this appeal, the relevant holding by the district court was its conclusion that the "legal incidence" of the cigarette tax does not fall on Yakama retailers. *Id.* at 1264 ("The Court finds that none of the differences between the scheme examined in *Colville* and the current scheme are sufficient to change the conclusion that the legal incidence of the tax does not fall on Indian retailers."). The district court dissolved the temporary restraining order and released the bond posted to the State. In this appeal, the Yakama seek reversal of the district court's summary judgment ruling that the legal incidence does not fall on Yakama retailers, but concede that the answer to that question will be dispositive of the other issues pressed in the their lawsuit.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction under 28 U.S.C. § 1291.

We review the district court's grant of summary judgment de novo. *Coeur d'Alene Tribe of Idaho v. Hammond*, 384 F.3d 674, 681 n.2 (9th Cir. 2004).

## DISCUSSION

## I.   Legal Incidence of the State Cigarette Tax

### A.   Indian Tax Immunity

**[1]** "The Constitution vests the Federal Government with exclusive authority over relations with Indian tribes . . ., and in recognition of the sovereignty retained by [the] tribes . . ., Indian tribes and [registered] individuals generally are exempt from state taxation within their own territory.' " *Oklahoma Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 455 (1995) (quoting *Montana v. Blackfeet Tribe*, 471 U.S. 759, 764 (1985)). "The initial and frequently dispositive question in Indian tax cases, therefore, is who bears the legal incidence of a tax. If the legal incidence of an excise tax rests on a tribe or on tribal members for sales made inside Indian country, the tax cannot be enforced absent clear congressional authorization." *Chickasaw Nation*, 515 U.S. at 456-57. However, where the legal incidence of tax does not rest on a tribe or its members, a state may impose the tax so long as "the balance of federal, state, and tribal interests favors the [s]tate, and federal law is not to the contrary," and a state "may place on a tribe or tribal members 'minimal burdens' in collecting the toll." *Id.* at 459 (citation omitted).

**[2]** The "legal incidence" of an excise tax refers to determining which entity or person bears the ultimate legal obligation to pay the tax to the taxing authority. *See Colville*, 447 U.S. at 150-51 ("We upheld the tax, insofar as sales to non-Indians were concerned, because its legal incidence fell on the non-Indian purchaser" as "the competitive advantage which the Indian seller . . . enjoy[ed] . . . [was] dependent on the extent to which the non-Indian purchaser is willing to flout his *legal obligation* to pay the tax." (emphasis added) (citing *Moe v. Confederated Salish & Kootenai Tribes of Flathead Reservation*, 425 U.S. 463, 482 (1976)). Identifying legal incidence requires a court to analyze the taxing statute and its imple-

mentation to determine which entities or individuals will likely face detrimental legal consequences if the tax is not paid. *See Moe*, 425 U.S. at 482; *Couer D'Alene Tribe of Idaho v. Hammond*, 384 F.3d 674, 681 (9th Cir. 2004) ("[T]o discern where the legal incidence lies, we 'ascertain [ ] the legal obligations imposed upon the concerned parties[.]' " (quoting *Crow Tribe of Indians v. Montana*, 650 F.2d 1104, 1111 (9th Cir. 1981))). "[A] party does not bear the legal incidence of the tax if it is merely a transmittal agent for the state tax collector[,]" because that party's legal liability in event of non-payment would depend either on another responsible party's failure to pay to the transmittal agent or on the transmittal agent's withholding collected taxes. *Hammond*, 384 F.3d at 681 (citing *Chickasaw Nation*, 515 U.S. at 461-62).

The person or entity bearing the legal incidence of an excise tax is not necessarily the one bearing an economic burden from the tax. *Hammond*, 384 F.3d at 681 (citing *Chickasaw Nation*, 515 U.S. at 460). While a party bearing an economic burden, perhaps as the result of reduced sales, may also bear the legal incidence of the tax, the Supreme Court has clarified that an economic analysis of the "realities" of taxation should not be a substitute for legal-incidence analysis. *Chickasaw Nation*, 515 U.S. at 459-60 ("If we were to make 'economic reality' our guide, we might be obliged to consider, for example, how completely retailers can pass along tax increases without sacrificing sales volume—a complicated matter dependent on the characteristics of the market for the relevant product."). Legal incidence "accommodates the reality that tax administration requires predictability," *id.*, and while a state cannot fully control how the market will adjust to a tax, a state can control tax enforcement and the determination of who is ultimately obligated to pay the tax. *Id.* at 460 ("[I]f a State is unable to enforce a tax because the legal incidence of the impost is on Indians or Indian tribes, the State generally is free to amend its law to shift the tax's legal incidence.").

Because few statutes are identical, legal-incidence determinations necessarily will depend on myriad, often situation-specific factors. In *Moe v. Confederated Salish & Kootenai Tribes of Flathead Reservation*, the Supreme Court upheld a Montana cigarette tax because the legal incidence of the tax was on the non-Indian purchaser, as the Court explained:

> Since nonpayment of the tax is a misdemeanor as to the retail purchaser, the competitive advantage which the Indian seller doing business on tribal land enjoys over all other cigarette retailers, within and without the reservation, is dependent on the extent to which the non-Indian purchaser is willing to flout his legal obligation to pay the tax. Without the simple expedient of having the retailer collect the sales tax from non-Indian purchasers, it is clear that wholesale violations of the law by the latter class will go virtually unchecked.

*Id.* at 482 (footnotes omitted). The *Moe* Court also rejected the argument that collecting the tax from non-Indian customers rendered the retailer an "involuntary agent" for collection because the obligation to collect was only "a minimal burden designed to avoid the likelihood that in its absence non-Indians purchasing from the tribal seller will avoid payment of a concededly lawful tax." *Id.* at 483.

**[3]** In *Chickasaw Nation*, the Court, in holding that the legal incidence of an Oklahoma motor-fuel tax fell on Indian retailers, gave special attention to two factors: whether the legislature specifically identified who bore the tax's legal incidence and whether the tax statute contained an explicit "pass through" provision requiring distributors and retailers to pass the tax onto consumers. 515 U.S. at 461. The Court stated that if the Oklahoma legislation "expressly identif[ied] who bears the tax's legal incidence," the language would be "dispositive." *Id.* ("In the absence of such dispositive language, the question is one of 'fair interpretation of the taxing

statute as written and applied.' " (quoting *Chemehuevi Tribe*, 474 U.S. at 11)). The Court returned to this concept of dispositive legislative identification in *Wagnon v. Prairie Band Potawatomi Nation*, 546 U.S. 95 (2005), by again referencing *Chickasaw Nation*'s "suggest[ion] that [ ] 'dispositive language' from the state legislature is determinative of who bears the legal incidence of a state excise tax." *See Wagnon*, 546 U.S. at 102.

In *Hammond*, we held that an Idaho motor-fuel tax fell on Indian retailers in light of its "striking" similarity with the tax voided in *Chickasaw Nation*, 515 U.S. at 450. Four key factors guided us: (1) the non-tribal distributors who received the motor fuel and sold it to the Indian tribes were required to pass on and to collect the tax from the retailer, and then to remit the taxes to the State; (2) the statute provided a tax credit to the distributor, but not a retailer, for "collecting and remitting" the tax on behalf of the State; (3) the State gave tax credits to the distributor for fuel taxes that the distributor has paid but cannot then collect from the retailer; and (4) retailers could not set off their tax liability when consumers failed to pay, nor were they compensated for their tax collection efforts. 384 F.3d at 685-88. In short, in addition to express statements of legislative intent, legal incidence analysis depends on whether a taxing statute contains an explicit "pass through" which moves incidence down the distribution chain, *Hammond*, 384 F.3d at 685-86, which individuals or entities are compensated for "collecting and remitting" the tax on behalf of the State, *id.* at 686, what invoices show regarding payment of the tax, *id.*, whether a retailer may recoup the tax paid for unsold product, *id.* at 684, if the retailer is refunded the tax when a consumer fails to pay, *id.* at 687-88, and ultimately who is penalized by state authorities when the tax is not paid, *Wagnon*, 546 U.S. at 103; *Moe*, 425 U.S. at 482.

## B.   The Washington Cigarette Tax

**[4]** We begin our analysis of the Act with the recognition that the primary issue before us was litigated and decided some three decades ago in *Colville*, 446 F. Supp. at 1339, *aff'd in part and rev'd in part*, 447 U.S. 134 (1980). There, a three-judge district court held that the legal incidence of the Washington cigarette tax, as then written, fell on non-Indian cigarette purchasers as opposed to Indian retailers. 446 F. Supp. at 1355. Although the district court found the absence of a pass through to be "of particular importance," *id.* at 1353, a broader consideration of the other statutory provisions and Department publications led to the conclusion that "the statute evidences the legislature's intent to impose the legal incidence of the tax at the earliest constitutional opportunity." *Id.* at 1355. Thus, "where on-reservation tribal sales to non-Indians [were] involved, the first taxable event [was] . . . the use or consumption by the non-Indian purchaser." *Id. Colville* reached the Supreme Court on direct appeal, and the Court "accept[ed]" the district court's conclusion that the legal incidence of the cigarette tax fell on the non-Indians purchasers. 447 U.S. at 142 n.9. The Court held, *inter alia*, that the collection burden imposed on Indian retailers was "legally indistinguishable from the collection burden upheld in *Moe*" and was therefore "valid *in toto*." *Id.* at 159-60.[4]

The Tribes claim that amendments to the Act since *Colville* have changed the legal incidence calculus, and the State does not argue that *Colville* precludes such a reexamination.[5] Spe-

---

[4]In *Colville*, the State required "smokeshop operators to keep detailed records of both taxable and nontaxable transactions. The operator must record the number and dollar volume of taxable sales to nonmembers of the Tribe. With respect to nontaxable sales, the operator must record and retain for State inspection the names of all Indian purchasers, their tribal affiliations, the Indian reservations within which sales are made, and the dollar amount and dates of sales." 447 U.S. at 159.

[5]The district court noted that "while Defendants argue the doctrine of *res judicata* defeats other arguments Plaintiffs advance, they do not argue that it applies to the issue of legal incidence." 680 F. Supp. 2d at 1264 n.1.

cifically, the Tribes contend that the absence of an express pass through, the inability of retailers to defer payment of the cigarette tax, the absence of compensation for collecting the cigarette tax, the liability Indian retailers face for unsold products, and the record keeping requirements of the amended Act shift the legal incidence of the cigarette tax onto the Indian retailers. We disagree.

We first consider the fact that the Act does not contain an express pass through requirement. Such a pass through requirement was also missing from the earlier version of the Act considered in *Colville. See* 446 F. Supp. at 1353. The current Act requires wholesalers to pass on all but a tiny fraction of the cigarette tax to their purchasers, RCW § 82.24.020(2) (allowing for wholesalers to absorb five one-hundredths cents per cigarette), but contains no corresponding requirement that retailers pass through the cigarette tax to the cigarette consumer. The absence of a pass through to consumers is significant and problematic, given the Supreme Court's observation in *United States v. Mississippi Tax Commission*, 421 U.S. 599 (1975), that "where a State requires that its sales tax be passed on to the purchaser and be collected by the vendor from him, this establishes as a matter of law that the legal incidence of the tax falls upon the purchaser." *Id.* at 608 (characterizing test from *First Agr. Nat. Bank of Berkshire Cnty. v. State Tax Comm'n*, 392 U.S. 339 (1968)).

In response, the State first contends that there is an implied pass through in the Act's pre-collection obligation. *See* RCW § 82.24.080. But a pre-collection obligation, even were we to accept the State's characterization, is not the functional equivalent of an explicit pass through as it does not resolve to a legal certainty who is obligated to pay the tax. While it would be prudent for any Indian retailer to pass on and then collect the tax from consumers, the Act does not *require* it; rather that is an economic choice left to the Indian retailers. In general, the Act is anchored by the principle that whoever can pay the tax first will pay. *See* RCW 82.24.080(1) ("It is the

intent and purpose of this chapter . . . to collect the tax from the person who first sells, uses, consumes, handles, possesses . . . or distributes them in the state.").

**[5]** Despite the absence of a pass through, we recognize that the Act sustained in *Colville* also did not include a pass through and that its absence was not outcome determinative. Moreover, the pre-collection obligation, even if not equivalent to a pass through, serves a purpose in setting forth the responsibilities of the Indian retailers as transmittal agents. That obligation to transmit the tax and the record keeping requirements it requires are the same as the obligations the Supreme Court endorsed in *Colville* as "legally indistinguishable from the collection burden upheld in *Moe*." 447 U.S. at 159. Thus, we will not treat the absence of a pass through as dispositive.

**[6]** Indeed, numerous provisions in the Act are written with the purpose of excluding Indian tribes and their members from compliance with the Act. After all, the cigarette tax applies only to the "first taxable event and upon the first taxable person" under RCW § 82.24.080. There is no dispute between the parties that as between an Indian retailer and a non-Indian purchaser, the latter is the *first* taxable person. Even if there were a dispute, § 82.24.900 provides that "[t]he provisions of this chapter shall not apply where the state is prohibited from taxing under the Constitution of this state or the Constitution or the laws of the United States," RCW § 82.24.900, a catch-all provision which includes the Tribes. Moreover, Section 82.24.260 states that "[o]ther than . . . [a]n Indian tribal organization with respect to sales to enrolled members of the tribe, a person who is in lawful possession of unstamped cigarettes and who intends to sell or otherwise dispose of the cigarettes shall pay, or satisfy its pre-collection obligation that is imposed by this chapter, the tax required by this chapter by remitting the tax . . . ." RCW § 82.24.260(1). A fair construction of these provisions leads to the conclusion that an Indian retailer will be excluded from paying a tax for sales to members. The language also indicates that if an

Indian retailer ever found itself facing a State collection effort for the retailer's non-payment of the tax, the retailer would be shielded from civil or criminal liability, except in the instance where the Indian retailer has failed to transmit the tax paid by the consumer and collected by the retailer.

**[7]** Section 82.24.020 references the *Colville* decisions upholding the tax and explicitly attempts to incorporate the Supreme Court's holding into the Act by providing the pre-collection obligation is a "minimal burden on the Indian tribal organization." *Colville* sustained the ability of a state to require Indian tribes to tax sales to nonmembers, observing that this would not "contravene the principle of tribal self-government, for the simple reason that nonmembers are not constituents of the governing Tribe." 447 U.S. at 160. By attempting to comply with *Colville*, the legislature reveals its intent to incorporate that holding which permits states to require Indian retailers to collect and transmit the tax from non-Indian, non-exempt purchasers. Finally, the Department's regulations speak of "collecting and remitting" the cigarette tax, WAC § 458-20-192(5)(c), which implies that someone other than the Indian retailer is ultimately responsible for payment of the cigarette tax.

These points of statutory construction are buttressed by the Act's legislative history; since *Colville*, there have been no amendments to the Act which alter the legal obligations for paying the tax. Rather, the key amendments have been administrative in nature—to preclude retailers from affixing stamps and to prevent retailers from absorbing a small amount of a stamp's cost. *See* 1995 Wash. Sess. Laws, ch. 278, §§ 2-4; 2003 Wash. Sess. Laws, ch. 114, § 1(4). These amendments affect, at most, the economic burden of the cigarette tax, primarily by shifting to wholesalers the entire cost of affixing stamps. Moreover, by precluding retailers from absorbing any portion of the cigarette tax, it is implied that they will need to pass on the entirety of the tax to consumers.

We also note that the Act does not compensate any party (wholesaler or otherwise) for serving as a collection agent for the State. *Contra Hammond*, 384 F.3d at 686. Although the Tribes argue that the State's failure to compensate them for fulfilling the pre-collection obligation indicates the legal incidence falls on the Indian retailers, non-Indian wholesalers and retailers are also *not* compensated for collecting the tax. Rather, the only compensation wholesalers receive is "for their services in *affixing* the stamps required under this chapter." RCW § 82.24.295(2) (emphasis added). As discussed *supra*, in *Chickasaw Nation* and *Hammond*, courts invalidated tax schemes where non-Indian distributors were compensated for their role as agents in collecting a tax while Indian retailers were not compensated. *See Chickasaw Nation*, 515 U.S. at 462 ("[F]or their services as agent of the state for [tax] collection, distributors retain a small portion of the taxes they collect."); *Hammond*, 384 F.3d at 686-87. Those factors are not present here as there is no discriminatory compensation scheme vis-a-vis wholesalers and retailers. Washington's cigarette tax ultimately makes consumers who possess unstamped cigarettes liable for a misdemeanor or felony, regardless of whether they purchased those cigarettes from Indians or non-Indians, whereas the statutes in *Chickasaw* and *Hammond* contained no downstream liability. *See* RCW §§ 82.24.260(3), 82.24.020(4).

The Tribes also have not posited a foreseeable scenario when an Indian retailer would have an obligation greater than transmittal agent. Instead, the only counter-scenarios offered by the Tribes involve situations where no sale is ever made to a customer, such as when cigarettes become damaged, or when a customer steals the cigarettes and does not tender the tax payment. The Act provides an express remedy in the first situation—RCW § 82.24.210 provides that the Department shall "promulgate rules and regulations providing for the refund to dealers for the cost of stamps affixed to articles taxed herein," where such products are damaged. That section also allows the Department to refund unused stamps. RCW

§ 82.24.210. In its briefing, the State has represented that "[r]efunds are available to anyone who is legally entitled to one" and that the refund form from the Department may be used by "any person," Appellees' Answering Brief at 48-50. Indeed, the Department's regulations provide that "*any person* may request a refund of the face value of the stamps when the tax is not applicable and the stamps are returned to the department." WAC § 458-20-186(203) (emphasis added). A reasonable interpretation of "any person" would include retailers, Indian or not, and there is no record evidence that the State has implemented this regulation in a discriminatory manner. Nor have the Tribes proffered any evidence that Indian retailers who have applied for tax-stamp refunds in accordance with the regulations have had their refund claims denied by the Department. In response to the hypothetical situation of non-payment of the tax by a customer who steals stamped cigarettes, the State concedes that the Department will not issue refunds to retailers for the cost of cigarette stamps, but a third-party breach of contract does not alter our interpretation of the Act. As with the damaged goods hypothetical, non-payment by a third-party would leave Indian retailers with other legal remedies to collect the cigarette tax.

Finally, the ability of wholesalers to defer their payment for thirty days by posting a bond does not impact our legal incidence analysis. *See* WAC § 458-20-186(301)(b). Deferring the payment of money due is a matter of timing and accounting, which does not change who is ultimately responsible for the payment of the tax. After all, the particular point in time when the retailers remit that tax *from the consumer* does not change the underlying fact that the retailer was not legally obligated to pay the tax. Timing is a matter of accounting; even though the Tribes want the tax to be treated as an account payable, instead of an immediate cash payment, the legal obligations remain the same.

**[8]** To summarize, despite the absence of a statutory pass through, we conclude that the overall intent of the Washing-

ton cigarette tax, with respect to on-reservation sales by Indian retailers, is for consumers to be legally obligated to pay the cigarette tax. The precollection obligation is a minimal burden on the Tribes and their retailers and does not change the legal incidence calculation. We therefore hold that the provisions of the current Act are not materially different from those upheld in *Colville*, and that they do not contravene established principles of Indian tax immunity.

## CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment and its dissolution of the temporary restraining order are **AFFIRMED**.

---

GUILFORD, District Judge, concurring in the judgment:

I concur in the result.

This case requires us to determine if a tax imposed on certain economic activity of the Tribes of the Yakama Nation creates a "legal incidence" upon the Tribes. The impact of various forms of taxation on a people has been apparent throughout our country's history, going back at least to when American patriots—ironically dressed as Indians—threw tea into Boston Harbor. The burden of taxation was the fuel in the fire of freedom ignited by our country's founders, and that burden continues to be a powerful factor in today's politics.

In this case, the tax burden must be analyzed through the prism of the "legal incidence" test, which often focuses on the issue of whether the tax can be passed through or passed along to others. An economist reviewing this "pass through" issue would analyze the demand elasticity for the product being taxed. In further review of the burden of taxation, an economist, aware of the negative slope of demand curves,

would conclude that increasing the price of a product through a tax necessarily will decrease sales volume. And in comparing the impact of immediate cash payments with deferred payments, an economist would review interests rates and the time value of money. But as the majority opinion recognizes, economic analysis of the burdens of taxation has been forbidden in reviewing "legal incidence." In *Oklahoma Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 459-60 (1995), the Supreme Court analyzed "legal incidence" while rejecting guidance from what it called the "more venturesome approach" involving economic reality, stating:

> If we were to make "economic reality" our guide, we might be obliged to consider, for example, how completely retailers can pass along tax increases without sacrificing sales volume—a complicated matter dependent on the characteristics of the market for the relevant product.

Indians in the Tribes of the Yakama Nation might well wonder how the analysis of what courts call "legal incidence" can be done without reviewing the economic reality of the tax burden on them. And here, a review of these economic realities likely would reveal that the tax at issue imposes an economic burden on Indians in the Yakama Nation. But the law requires an analysis through a prism that blocks economic reality. Thus, following Supreme Court authority, without the guidance of economic reality, I must concur with the majority's opinion. Apart from economic reality, the provisions of the Revised Code of Washington §§ 82.24 *et seq.* are not materially different from those upheld in *Washington v. Confederated Tribes of the Colville Indian Reservation*, 447 U.S. 134 (1980), and they follow established principles of Indian tax immunity. Thus, I concur in the judgment.